## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | | |
|---|---|---|
| **KRISTIN SAMPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 2:22-cv-62** |
| | ) | |
| **COLOPLAST CORPORATION and** | ) | **JURY TRIAL DEMANDED** |
| **COLOPLAST MANUFACTURING US, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff, Kristin Sampson ("Plaintiff"), by and through her attorneys of record and for her cause of action against Defendants, Coloplast Corporation and Coloplast Manufacturing US, LLC (collectively, "Defendants"), states and alleges as follows:

## PARTIES

1.      Plaintiff is now and was at all times material hereto a citizen and resident of the state of Florida, domiciled in Bonita Springs, Florida.  Plaintiff was implanted with and subsequently injured by Defendants' Aris Transobturator Sling in Bonita Springs, Florida.

2.      Defendant Coloplast Corporation ("Coloplast Corp.") is a citizen of Delaware and Minnesota. Coloplast Corp was incorporated in the State of Delaware and maintains its principal place of business at 1601 West River Road North, Minneapolis, Minnesota 55411.

3.      Defendant Coloplast Manufacturing US, LLC is a citizen of Delaware and Minnesota. Defendant Coloplast Manufacturing US, LLC is a limited liability corporation organized and existing under Delaware law, maintaining its principal place of business at 1940 Commerce Drive, North Mankato, Minnesota 56002.  Coloplast Manufacturing US, LLC is a wholly owned subsidiary of Coloplast Corp.  Coloplast Manufacturing's sole member is

492554.2

Coloplast Corp. which is a citizen of Minnesota and Delaware. At all times material hereto, neither Coloplast Manufacturing US, LLC, nor any of its members are or were citizens of the state of Florida.

4.      Coloplast Corp. and Coloplast Manufacturing US, LLC are collectively referred to herein as "Coloplast."

5.      All acts and omissions of Defendants, as described herein, were done by their agents, servants, employees, and/or owners acting in the course and scope of their respective agencies, services, employments, and/or ownership.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs, and complete diversity of citizenship exists between Plaintiff and Defendants.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendants do business in this judicial district, subjecting the Defendants to personal jurisdiction in this action and making them "residents" of this judicial district. Further, Plaintiff was implanted with and subsequently injured by Defendants' Aris Transobturator Sling in Bonita Springs, Florida, which is in this judicial district.

8.      This Court can exercise personal jurisdiction over the Defendants under Florida's Long-Arm Statute because Defendants committed a tort in whole or in part in this state. Fla. Stat. Ann. § 48.193.

## FACTUAL ALLEGATIONS

### A.      General Factual Allegations

9.      This is an action to recover damages for personal injuries suffered by Plaintiff as a result of the medical device Aris ("Aris" or "the Product"), as designed, formulated,

compounded, manufactured, produced, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants.

10. At all times herein mentioned, the officers and directors of Defendants participated in, authorized and directed the design, manufacture, production, labeling, packaging, advertising, marketing, promotion, and selling of the Aris mesh when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the Aris mesh and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff.

11. At all times material to this action, Defendants have designed, formulated, compounded, manufactured, produced, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, and sold a line of pelvic mesh products intended to treat stress urinary incontinence. Each of these products was cleared for sale in the United States after the Defendants made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy.

12. The Aris, used to female treat stress urinary incontinence, consists of a transobturator ("groin") mesh and introducer needles. The mesh is an implantable support mesh that is made from knitted monofilament polypropylene fibers and is small-pore, heavyweight and stiff. The introducer needles are necessary for the implantation of the mesh and are included in the Aris mesh kit.

13.     In 2005, the Aris groin mesh was cleared by the Food and Drug Administration through "Substantial Equivalence" to the Mentor Worldwide LLC ("Mentor") ObTape groin mesh under Section 510(k) of the Food, Drug and Cosmetic Act.

14.     Mentor began to first market its ObTape brand groin vaginal mesh in the United States in 2003.

15.     Upon information and belief, at the time that Mentor first introduced its ObTape brand groin vaginal mesh to the market in 2003, the product had undergone inadequate pre-market testing to determine the safety and efficacy of the medical device prior to implantation in humans, and said testing was limited to animal testing (and included only three rabbits).

16.     However, even the limited animal testing conducted by Mentor prior to first marketing the ObTape brand groin vaginal sling in 2003 had demonstrated that the medical device caused adverse tissue reactions in the rabbits.

17.     After 2003, upon information and belief, Mentor performed no additional safety or efficacy testing in human vaginal tissues to confirm that the medical device was safe and effective for use in women.

18.     From 2003 through March of 2006, Mentor continued to manufacture, market, distribute, and sell this device to thousands of women even though Mentor knew that the product had been inadequately tested for safety and efficacy (both prior to and after its approval for sale in the United States), contained significant manufacturing and design defects that posed unnecessary risks to patients, and also despite knowing that numerous patients had suffered harm attributable to the defective condition of the medical device.

19.     Prior to Plaintiff's implantation with the Aris device, Defendants were on notice of numerous patients who had been harmed by the ObTape brand groin vaginal mesh, including

a significant number of women who suffered vaginal erosion, infection, complex recurring extrusions, chronic vaginal, pelvic and groin pain, inability to engage in intercourse, perforation and / or abscess after implantation with its device.

20.     Coloplast's website describes its various Product, including those for treating "Stress Urinary Incontinence," including "Sling Procedures." These products included the Aris Transobturator Sling, which was implanted in Plaintiff.

21.     On July 13, 2011, the FDA issued a new warning regarding serious complications associated with transvaginal mesh, manufactured, marketed, and distributed by Defendants.  In this warning, the FDA indicated that serious complications associated with the transvaginal mesh were not rare, which was a change from what the FDA reported in October 2008.  The FDA had also received increased reports of complications associated with the transvaginal mesh in both SUI and POP cases.

22.     On August 25, 2011, Public Citizen, a consumer advocacy group, submitted a petition to the FDA seeking to ban the use of transvaginal mesh products in pelvic repair procedures.  In its Petition, Public Citizen warned that the transvaginal mesh should be recalled because it offers no significant benefits but exposes patients to serious risks and the potential for permanent life-altering harm.  Joining Public Citizen as co-petitioners were Dr. L. Lewis Wall, a professor of obstetrics and gynecology at Washington University in St. Louis, Missouri, and Dr. Daniel S. Elliott, a urologic surgeon specializing in female urology at the Mayo Clinic in Rochester, Minnesota.

23.     Defendants used data from Florida doctors and Florida patients, who had been implanted with Coloplast mesh devices, to push back against the FDA Public Health Notification in an attempt to persuade Florida physicians as to the safety of their mesh devices.

24.     Defendants were aware or should have been aware of the dangers inherent in the Aris Transobturator Sling, notwithstanding the fact that the product was "cleared" for sale by the FDA.

25.     At all relevant times, Defendants were in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, advertising, and delivering, and introducing into interstate commerce, including, *inter alia*, within the United States, either directly or indirectly through third parties, subsidiaries or related entities, Pelvic Mesh Products, including the Aris implanted in Plaintiff.

26.     Defendants made the decision to use and continue to market a knitted polypropylene mesh with small pores that was heavyweight and stiff in the Aris groin mesh medical device. Numerous scholarly articles and research have concluded polypropylene mesh with small pores that is heavyweight and/or stiff is dangerous and increases the frequency, severity and duration of injuries from transvaginal mesh devices. Specifically, the small pore polypropylene mesh and/or heavyweight and/or stiff mesh causes complex erosions and extrusions in women that persistently recur, chronic pelvic, vaginal and groin pain, inability to engage in intercourse and the complex painful revision surgeries to cut and tug mesh pieces from the women's vaginas and groins. Defendants made the decision to continue to market the Aris groin mesh with small pores that was heavyweight and stiff and not to warn of the increased dangers associated with monofilament knitted polypropylene mesh. On information and belief, the Aris groin mesh has the smallest pores of any transvaginal mesh that has not been removed from the market in the United States.

27.     Defendants made the decision to use and continue to market a low elasticity or stiff polypropylene mesh in the Aris groin mesh medical device. Coloplast touts the stiffness of

its Aris groin mesh as having "low elasticity." Numerous scholarly articles and research have concluded stiff polypropylene mesh is not compatible with soft vaginal tissue, is dangerous, and increases the frequency, severity and duration of injuries from transvaginal mesh devices. Specifically, the stiff polypropylene mesh causes complex erosions and extrusions in women that persistently recur, chronic pelvic, vaginal and groin pain, inability to engage in intercourse and the complex painful revision surgeries to cut and tug mesh pieces from the women's vaginas and groins. Defendants made the decision to continue to market the Aris groin mesh with stiff mesh and to not warn of the increased dangers associated with using a stiff polypropylene mesh. On information and belief, the Aris groin mesh is the stiffest transvaginal mesh marketed in the United States.

28.     Defendants made the decision to use and continue to market a low elasticity or stiff polypropylene mesh in the Aris groin mesh medical device without the use of a protective sheath covering the mesh during the manufacturing, shipment and implantation of the groin mesh. Numerous scholarly articles and research have concluded stiff polypropylene mesh is dangerous and increases the frequency, severity and duration of injuries from transvaginal mesh devices. Specifically, the stiff polypropylene mesh without a protective sheath covering the mesh during implantation causes vaginal and groin tissue inflammation, vaginal and groin tissue irritation, vaginal and groin tissue damage and chronic vaginal and groin pain when the stiff monofilament groin mesh traverses through the groin and vagina of women during implantation. Defendants made the decision to market the Aris groin mesh without a protective sheath on the stiff mesh and to not warn of the increased dangers associated without the protective sheath covering stiff polypropylene mesh during manufacturing, shipment and implantation of the

mesh. On information and belief, the Aris groin mesh is the only groin mesh in United States to treat incontinence that does not utilize a protective sheath.

29.     Defendants made the decision to use and continue to market the stiff polypropylene mesh with small pores and without a protective sheath in the Aris groin mesh medical device resulting in mesh that contracts, curls, coils, migrates and erodes through vaginal tissue after it is introduced into soft vaginal tissue. Numerous scholarly articles and research have concluded stiff polypropylene mesh with small pores is not compatible with soft vaginal tissue, is dangerous, and increases the frequency, severity and duration of injuries from transvaginal mesh devices because of the mesh does not hold in place after it is introduced into the body. Specifically, the stiff polypropylene mesh with small pores contracts, moves around, migrates, deforms, curls, coils, folds over and causes complex erosions and extrusions in women that persistently recur, chronic pelvic, vaginal and groin pain, inability to engage in intercourse and the complex painful revision surgeries to cut and tug mesh pieces from the women's vaginas and groins. Defendants made the decision to continue to market the Aris groin stiff mesh with small pores and to not warn of the increased dangers associated with using a stiff polypropylene mesh with small pores and no protective sheath that does not hold in place after it is implanted. On information and belief, the Aris groin mesh has the lowest holding force of any transvaginal mesh marketed in the United States to treat incontinence.

30.     Defendants chose to design and market the Aris groin mesh without a stiff mesh and with no protective sheath to appeal to its customers with an attempt to "reduce the complexity of the procedure and surgery time" and for a "quick insertion." Decreasing the surgery time is an important marketing tool used by Defendants to sell the device to surgeons. Defendants knew that while this design feature could aid in the marketing of the device, it was in

exchange for the serious, life-long, irreversible injuries to patients that would be caused by this design.

31.     The scientific evidence shows that this stiff polypropylene mesh with small pores as implanted in the Plaintiff is biologically incompatible with vaginal tissue and when used as a woven or knitted alloplastic textile prosthetic mesh in the vagina, stiff small pore polypropylene mesh promotes a severe foreign body reaction and chronic inflammatory response in women implanted with Defendants' Pelvic Mesh Products. This "host defense response" by a woman's pelvic tissues promotes deformation, curling, coiling and stiffening of the mesh, mesh migration, contraction and shrinkage of the mesh, excessive scarring and scar plating around the mesh, and degradation of the polypropylene mesh and the pelvic tissue, and causes chronic inflammation of the pelvic tissue and tissue damage, chronic infectious response and chronic pelvic, vaginal and groin pain. It also can cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the mesh.

32.     Defendants did not, and have not, adequately studied the extent of the risks associated with the Aris groin mesh intended to be permanently implanted in a woman's body. On information and belief, Defendants have not made any effort or spent any time, money or resources to conduct long-term randomized controlled trials with safety as the primary end-point to study the frequency, severity and duration of adverse events associated with the Aris groin mesh.

33.     Defendants knew or should have known that the Aris stiff mesh with small pores unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks. At the time Defendants began

marketing the Aris, and at the time Plaintiff was implanted with the Aris groin mesh, Defendants were aware that the Aris was associated with life-long irreversible adverse events and that the Aris was unreasonably dangerous and increased the frequency, severity and duration of adverse events due to its unsafe design features described herein. Notably, Defendants were aware the Aris was substantially equivalent in material, function, performance and design to the Mentor ObTape mesh, which had been removed from the market due to safety concerns associated with the dangerous design features of the ObTape.

34.     On information and belief, Defendants have not made any effort or spent any time, money or resources in educating physicians, or patients, in how, if at all possible, to safely remove the Aris groin mesh from a woman's body if complications occur.

35.     Defendants misled doctors and patients as to the performance, efficacy and safety of the Aris groin mesh device.

36.     After a segment on 60 Minutes detailing the safety risk associated with mesh imported from China, Defendants distributed a letter mollifying concerns of its consumers but failed to ever mention the Aris groin mesh was stiffest mesh on the U.S. market, had the smallest pores of any groin mesh on the U.S market, and had the lowest holding force of any groin mesh on the U.S. market and the safety concerns associated with these design features of the Aris.

37.     Defendants misrepresent on their website that the Aris groin mesh has large pores, is "less dense" than other mesh, performs "similar to collagen fibers" where the mesh is implanted, and due to the design of the mesh there is only minimal "trauma to the surrounding tissue" when the mesh is implanted and traverses through a woman's vaginal tissue.

38.     Defendants misrepresent the Aris groin mesh "offers high success rates and low complications." Defendants withdrew this statement from their website recently after it was included in an expert report submitted in the transvaginal mesh multi-district litigation.

39.     Defendants misrepresent the Aris groin mesh is "minimally invasive."

40.     Defendants misrepresent the Aris groin mesh has "optimal tissue integration" and the design the mesh minimizes an increase in inflammatory response.

41.     Defendants intended patients and doctors to rely on these statements in choosing the Aris groin mesh.

42.     Defendants knew or should have known the statements were false.

43.     Defendants knew there was no adequate scientific data to support these statements.

44.     Defendants failed to conduct adequate research to determine whether these statements had any basis in fact.

45.     To this day, the Aris groin mesh continues to be marketed by Defendants to the medical community and to patients as safe, effective and reliable medical devices, implanted by safe, effective and minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of stress urinary incontinence, and other competing products.

46.     Defendants omitted and downplayed the risks, dangers, defects, and disadvantages of the Aris groin mesh, and advertised, promoted, marketed, sold and distributed the Aris groin mesh as a safe medical device with high success and low complications when Defendants knew or should have known that the Aris groin mesh was not safe for its intended purpose, and that the Aris would cause, and did cause, serious medical problems, and in patients,

including Plaintiff, catastrophic injuries. The magnitude and frequency of these problems were not disclosed and were hidden from physicians and patients.

47.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, groin mesh has high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making the Aris groin mesh defective under the law.

48.     Defendants have paid millions of dollars to individual consultant surgeons to adopt the device in their practice to induce other healthcare providers in purchasing their products. These "seeding trials" are a form of marketing conducted in the name of research by Defendants, specifically designed to target product sampling towards selected consumers.

49.     Defendants have paid millions of dollars to consultant surgeons to have access and control over data that would be published on the safety of the devices used by their consultant surgeons.

50.     Defendants have paid millions of dollars to individual consultants to help market their products and conceal the safety risks of their products to the medical community and public at large.

51.     Defendants have paid millions of dollars to individual consultants and groups to lobby and make misrepresentations on their behalf to healthcare providers, safety organizations and the public and improperly influence articles and coverage related to their devices including the Aris groin mesh.

52.     These individual consultant surgeons have been paid millions of dollars by manufacturers of vaginal mesh devices, like the Aris groin mesh, without the knowledge of

Plaintiff, her medical providers or the medical community. Defendants have improperly concealed the total amounts of money they have paid consultants and groups to market, lobby and make misrepresentations on their behalf related to the safety of their devices including the Aris groin mesh.

53.     In addition to the defects listed herein, the design of the Aris groin mesh causes adverse tissue reactions and tissue death with a chronic inflammatory response, the mesh becomes more rigid and stiff and hardens with the presence of mesh in the this area of the body, and the mesh is inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse reactions and serious and permanent injuries that surgeons are unable to effectively completely alleviate due to the adherence of the mesh and scar- plating around the mesh in the woman's groin and vagina.

54.     The Aris groin mesh is also defective due to Defendants' failure to adequately warn or instruct Plaintiff and/or her health care providers, while at the same time misrepresenting the safety and performance features of the Aris groin mesh.

55.     Defendants under reported and continue to underreport information about the propensity of the Aris groin mesh to fail and cause injury and complications and have made unfounded representations regarding the efficacy and safety of the Products through various means and media.

56.     Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to the Product.

57.     Defendants failed to design and establish a safe, effective procedure for removal of the Product, or to determine if a safe, effective procedure for removal of the Product exists.

58.     Feasible, suitable and safer alternatives to the Product have existed at all times relevant that do not present the same the severity of risks as do the Product.

59.     The Products were at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the Instructions for Use ("IFU"), created the procedures for implanting the devices, distribute instructional videos and materials, and trained the implanting physicians.

60.     Defendants knowingly provided incomplete and insufficient training and information to physicians regarding the use of the Product and the aftercare of patients implanted with the Product, as well as incomplete, insufficient and misleading information regarding the risks and complications associated with the Aris, its mesh, and its implantation.

61.     As a result of these life-altering and, in some cases, permanent injuries, Plaintiff has suffered severe emotional pain and injury and has suffered and will suffer apprehension of increased risk for injuries, infections, pain, mental anguish, discharge, and multiple corrective surgeries as a result of implantation of mesh.

62.     The Product implanted in the Plaintiff was in the same or substantially similar condition as it was when it left Defendants' possession, and in the condition directed by and expected by Defendants.

63.     In many cases, including Plaintiff's, women have been forced to undergo extensive medical treatment including, but not limited to, operations to locate and remove fragments of the mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage,

the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

64.     Removal of segments of the contracted, curled, coiled, eroded, stiffened, small pore, scar-plated and/or infected transvaginal mesh can require multiple surgical interventions and result in further scarring on fragile compromised pelvic tissue and muscles.

65.     At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff named and the general public on notice of the dangers and adverse effects caused by implantation of the Aris groin mesh.

66.     The Aris groin mesh as designed, manufactured, distributed, marketed, sold and/or supplied by Defendants was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of safety.

### B.     Case Specific Factual Allegations

67.     On November 22, 2019, at the SCA – Trails Edge Surgery Center in Bonita Springs, Florida, Plaintiff Kristin Sampson was implanted with an Aris transobturator device, which was designed, manufactured, packaged, labeled, marketed, and sold by Defendants. Rolando Rivera, M.D. performed the Aris implant procedure to treat Plaintiff's stress urinary incontinence.

68.     Plaintiff's implanting physician implanted the Aris properly, appropriately, and within the standard of care.

69.     After Plaintiff developed mesh erosion/exposure, vaginal pain, pelvic pain, dyspareunia, thigh pain, flank pain, dysuria, infection, bleeding, frequency, urgency, urge incontinence, recurrent SUI, and mixed incontinence, as well as additional mesh complications,

as a direct and proximate result of the Aris, Plaintiff underwent a mesh excision/revision procedure on February 14, 2020, performed by Rolando Rivera, M.D. at Trails Edge Surgery Center in Bonita Springs, Florida.

70.     Due to recurrent mesh erosion/exposure, which was twisted and tender, and continued vaginal pain, pelvic pain, dyspareunia, thigh pain, flank pain, dysuria, infection, bleeding, urge incontinence, recurrent incontinence, and mixed incontinence, as well as additional mesh complications, as a direct and proximate result of the Aris, Plaintiff underwent a second mesh excision/revision procedure on or around July 15, 2020, performed by Lennox Hoyte, M.D. in Tampa, Florida.

71.     As a direct and proximate result of the defective conditions of the Coloplast Aris transobturator vaginal mesh sling, including but not limited to the wrongful acts, negligence, omissions and fraudulent representations of Defendants, Plaintiff suffered and continues to suffer serious and permanent bodily injuries, including, but not limited to, vaginal, pelvic, sexual, groin, thigh, flank, and bladder pain and suffering, complex recurring mesh erosions/exposures, bleeding, infections, chronic urinary dysfunction (including, but not limited to, dysuria, bladder and urinary tract infections, urge incontinence, recurrent incontinence, and mixed incontinence), chronic inflammation, chronic foreign body reaction, scar plate formation, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation (including, but not limited to, mesh twisting, curling, folding, bunching, coiling, contracting, shrinking, collapsing, degrading, flaking, hardening, and stiffening, interventions, procedures, and extensive care and treatment for mesh-related complications and injuries, and the need for multiple painful surgical interventions to remove Aris mesh, as well as the need for continuing and future medical care and treatment.

She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

72.     The acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of Plaintiff and other users of the Product and for the primary purpose of increasing Defendants' profits from the sale and distribution of the Product

## COUNT I: NEGLIGENCE

73.     Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth herein.

74.     At all times material hereto, Defendants had a duty to Plaintiff and to other foreseeable users of the Product to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, labeling, assembling, packaging, distribution, detailing, promotion and sale of the Product.

75.     Defendants had a further duty to provide adequate and sufficient instructions concerning the proper use of the Product, as well as warnings of the risks and dangers associated with using the Product, to Plaintiff and to other foreseeable users of the Product.

76.     Defendants breached their duties to Plaintiff when they failed to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, labeling, assembling, packaging, distribution, detailing, promotion, and sale of their Product so as to avoid unreasonable risk of harm to women in whom the Product was implanted, including Plaintiff.

77.     Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Product.

78.     The Product implanted in Plaintiff was unreasonably dangerous and defective for reasons that include, but are not limited to, the following:

a)      The use of polypropylene material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b)      The design of the Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c)      Biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d)      The propensity of the Product to "creep" or to gradually elongate and deform when subject to prolonged tension inside the body;

e)      The inelasticity of the Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

f)      The propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction and results in continuing injury over time;

g)      The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturer's instructions;

h)      The Product degrades over time, causes chronic foreign body reactions, fibrotic bridging, mesh contracture / shrinkage, fraying, deformation, roping, rolling and curling of the mesh;

i)      Adequate studies to establish safety and effectiveness for permanent human implantation to treat SUI are lacking;

j)      The IFUs that Defendants provided with the Product do not fully disclose or adequately warn about the Product's known or knowable risks, adverse reactions, and characteristics;

k)      The use of polypropylene material in the Product and the failure to provide adequate IFUs and training;

l)      Defendants failed to design and establish a safe, effective procedure for removal of their Product; therefore, in the event of a failure, injury, or complication, it is impossible to easily and safely remove;

m)      Defendants used non-medical grade material to make their Product; and

n)      The pore size and stiffness of the Product were unsafe and resulted in unnecessary complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue.

79.      Defendants also breached their duty to adequately and sufficiently warn Plaintiff and her healthcare providers and other foreseeable users of the Product's propensity to erode, the rate and manner of mesh erosion, the risk of chronic infections resulting from implantation of the Product, the risk of vaginal scarring as a result of implantation of the Product, the risk of recurrent severe pelvic pain and other pain resulting from the implantation of the Product, the need for corrective or revisionary surgery to adjust or repair the Product, or the overall severity of complications that could arise as a result of implantation of the Product.

80.      Defendants' Product incorporates a monofilament polypropylene mesh unintended for the treatment of SUI. Despite claims that this material is inert, the emerging scientific evidence suggests that this material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving Defendants' Product containing this material. This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. Moreover, the mesh migrates within the surrounding tissues causing irreparable damage to the tissue including nerve endings residing within the tissues. Damaged nerve endings do not regenerate and lead to debilitating neuromas suffered by patients such as Plaintiff.

81.      Defendants made claims and representations in documents submitted to the FDA, in reports to the public and to healthcare professionals, and in advertisements that the Product did not present serious health risks.

82.    These and other representations made by Defendants were false when made and/or were made with the pretense of actual knowledge, when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

83.    These and other representations made by Defendants were made with the intention of deceiving Plaintiff, Plaintiff's healthcare professionals, and other members of the healthcare community and were made in order to induce Plaintiff and her healthcare professionals to rely on misrepresentations and caused Plaintiff to purchase, rely, use, and request the Product and her healthcare professionals to dispense, recommend, or prescribe the Product.

84.    Defendants' Product has been and continues to be marketed to the medical community and to patients as a safe, effective, reliable, medical device implanted by safe and effective minimally invasive surgical techniques for the treatment of medical conditions involving SUI and as safer and more effective as compared to the traditional products and procedures for SUI treatment and other competing pelvic mesh products.

85.    The Defendants have marketed and sold the Product to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, and private offices and include the provision of valuable cash and non-cash benefits to health care providers. Also utilized are documents, brochures, and websites offering exaggerated and misleading expectations as to the safety and utility of the Product.

86.    Contrary to the Defendants' representations and marketing to the medical community and to the patients themselves, the Defendants' Product has high failure, injury, and

complication rates, fails to perform as intended, requires frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making it defective under the law. The Defendants consistently have underreported and withheld information about the propensity of the Product to fail and cause injury and complications, have misrepresented the efficacy and safety of the Product, and, through various means and media, have actively and intentionally been misleading the FDA, the medical community, patients, and the public at large.

87.     Defendants knew and had reason to know that the Product could and would cause severe and grievous personal injury to users and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

88.     Defendants knew or had reason to know that Plaintiff and her physicians and other healthcare providers had no way to determine the truth behind Defendants' concealment and omissions and that these included material omissions of facts surrounding the use of the Product, as described in detail above.

89.     In reliance upon these false representations, Plaintiff was induced to and did use the Product, thereby sustaining severe and permanent personal injuries and damages.

90.     Had Plaintiff or her treating physician known of the unreasonably dangerous risks associated with the Product at the time of her implant surgery, such knowledge would have affected the treating physician's use of the Product, and Plaintiff would not have consented to the implantation of the device.

91.     As a direct and proximate result of Defendants' breaches of duty, as described above, Plaintiff has suffered serious and permanent physical and mental injuries, as set forth

herin. Additionally, Plaintiff has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

92.     As a direct, proximate, and foreseeable result of Defendants' negligence, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT II:  STRICT LIABILITY – DESIGN DEFECT

93.     Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth herein.

94.     The Product implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein with respect to its design. The Product's design defects include, but are not limited to:

a)      The use of polypropylene material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b)      The design of the Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c)      Biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d)      The propensity of the Product to "creep" or to gradually elongate and deform when subject to prolonged tension inside the body;

e)      The inelasticity of the Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

f)      The propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction and results in continuing injury over time;

g)      The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturer's instructions;

h)     The use of polypropylene material in the Product and the failure to provide adequate IFUs and training; and

i)     The pore size and stiffness of the Product were unsafe and resulted in unnecessary complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue

95.     Feasible and suitable alternative designs, as well as suitable alternative procedures and instruments for implantation, have existed at all times relevant as compared to the Product.

96.     The Product implanted into Plaintiff was in the same or substantially similar condition as it was when it left the possession of the Defendants and in the condition directed by and expected by the Defendants.

97.     Plaintiff and her physicians foreseeably used and implanted the Product and did not misuse or alter the Product in an unforeseeable manner.

98.     The medical and scientific literature studying the effects of polypropylene pelvic mesh, like Defendants' Product, have examined each of these injuries, conditions, and complications and determined that they are, in fact, causally related to the mesh itself and do not often implicate errors related to the implantation of the devices.

99.     As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering and has sustained permanent injury, as set forth herein, has undergone medical treatment and will likely undergo future medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

100.     Defendants are strictly liable to Plaintiff for designing, marketing, labeling, packaging, and selling the defective Product.

## COUNT III:  STRICT LIABILITY – MANUFACTURING DEFECT

101.    Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth herein.

102.    The Product implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein as a matter of law with respect to its manufacture, in that it deviated materially from Defendants' design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to Plaintiff.

103.    At all relevant times, Defendants were the manufacturer of the Product.

104.    Defendants designed, manufactured, prepared, assembled, marketed, labeled, distributed, and sold the Product.

105.    The Defendants designed the Product as a permanent implant for long term use within the human body.

106.    However, due to the manufacturing defects of the Product, the Product was not safe or effective for long term use.

107.    Manufacturing issues include using non-medical grade material and inadequate specifications that were not adhered to in the manufacturing of the Product.

108.    The Product is not compatible with human tissue and promotes an immune response in a large subset of the population.

109.    The Defendants' Product has high failure, injury, and complication rates, fails to perform as intended, requires frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making it defective under the law.

110.    The Product implanted into Plaintiff was in the same or substantially similar condition as it was when it left the possession of the Defendants and in the condition directed by and expected by the Defendants.

111.    The Product was at all times utilized and implanted in a manner foreseeable to the Defendants, as Defendants generated the IFUs, created the procedure for implanting the Product, and trained the implanting physicians.

112.    As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering and has sustained permanent injury, as set forth herein, has undergone medical treatment and/or corrective surgery and hospitalization, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

113.    Defendants are strictly liable to Plaintiff for manufacturing and selling the defective Product.

## COUNT IV: STRICT LIABILITY – FAILURE TO WARN

114.    Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth herein.

115.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff, Plaintiff's healthcare providers, and the FDA.

116.    The Product implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein as a matter of law due to its lack of appropriate and

necessary warnings. Specifically, Defendants did not provide sufficient or adequate warnings regarding, among other subjects:

a)   The Product's propensities to contract, retract, and/or shrink inside the body;

b)   The Product's propensities for degradation, fragmentation, disintegration and/or creep;

c)   The Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d)   The rate and manner of mesh erosion or extrusion;

e)   The risk of chronic inflammation resulting from the Product;

f)   The risk of chronic infections resulting from the Product;

g)   The risk of permanent vaginal or pelvic scarring as a result of the Product;

h)   The risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

i)   The need for corrective or revision surgery to adjust or remove the Product;

j)   The severity of complications that could arise as a result of implantation of the Product;

k)   Treatment of SUI with the Product is no more effective than feasible available alternatives;

l)   Treatment of SUI with the Product exposes patients to greater risk than feasible available alternatives;

m)   Treatment of SUI with the Product makes future surgical repair more difficult than feasible available alternatives;

n)   Use of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

o)   Removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

p)   Complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain;

q)   The nature, magnitude, and frequency of complications that could arise as a

result of implantation of the Product; and

r)      The material was never intended to be used in a medical device permanently implanted in the body and the material was non-medical grade.

117.    Defendants acted unreasonably in failing to undertake their duties to properly know the qualities of the Product and, in representations to Plaintiff and/or to Plaintiff's health care providers, concealed and intentionally omitted the following material information:

a)      That the Product was not as safe as other products and procedures available to treat SUI;

b)      That the risk of adverse events with the Product were higher than with other products and procedures available to treat SUI;

c)      That the risk of adverse events with the Product were known by Defendants and were not adequately tested;

d)      That the limited clinical testing revealed the Product had a higher risk of adverse effects in addition to and above and beyond those associated with other products and procedures available to treat SUI;

e)      That Defendants failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

f)      That Defendants were aware of dangers in their Product, including the pelvic mesh systems, in addition to and above and beyond those associated with other products and procedures available to treat SUI;

g)      That the Product was dangerous and caused adverse side effects, including, but not limited to, higher incidence of erosion and failure at a much more significant rate than other products and procedures available to treat SUI;

h)      That patients frequently would need revisionary surgery due to changes in the structure of the Product that would cause it to become loose or shift position within the body;

i)      That patients needed to be monitored more regularly than usual while using the Product and, in the event the Product needed to be removed, that the procedure to remove the Product had a very high failure rate and/or needed to be performed repeatedly;

j)      That material the Defendants were using carried a specific safety warning to never be used as a permanent implant in the human body;

k)    That Defendants rushed the Product to market against the concerns of consultants and employees;

l)    That Defendants were aware of safety issues with design of the Product and the pain it caused to patients and lack of effectiveness; and

m)    That Defendants were aware the Product was not as safe or efficacious as other alternatives.

118.    Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of the Product, including, but not limited to, the heightened risks of erosion, failure, and permanent injury.

119.    Defendants misrepresented to the medical and healthcare community, Plaintiff, the FDA, and the public at large that the Product had been tested and were found to be safe and effective for the purpose of treating SUI.

120.    These representations were made by Defendants with the intent of inducing Plaintiff, the medical community, and the public to recommend, prescribe, dispense, and purchase the Product for use as a means of treatment for SUI, all of which evinced an indifference to the health, safety, and welfare of Plaintiff.

121.    Defendants had sole access to material facts concerning the defective nature of the Product and its propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Product.

122.    At the time these representations were made by Defendants and at the time Plaintiff used the Product, she was unaware of the falsehood of these representations, and reasonably believed them to be true.

123.    Defendants' concealment and omissions of material facts concerning the safety of the Product were made to cause Plaintiff's physicians and healthcare providers to purchase,

prescribe, and/or dispense the Product; and/or to mislead Plaintiff into reliance and cause Plaintiff to use the Product.

124.    The Defendants provided incomplete, insufficient, and misleading training and information to physicians in order to increase the number of physicians utilizing the Product and, thus, increase the sales of the Product, leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

125.    Defendants intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the Product, specifically that it did not have dangerous and/or serious adverse health safety concerns and that it was as safe as other means of treating SUI.

126.    Defendants intentionally failed to inform the public, including Plaintiff, of the high failure rate, erosion, the difficulty of removing the Product, and the risk of permanent injury.

127.    Instead, Defendants chose to over-promote the safety, efficacy, and benefits of the Product.

128.    Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Product, she would not have purchased, used, or relied on the Product.

129.    As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering and has sustained permanent injury, as set forth herein, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

130.     Defendants are strictly liable to Plaintiff for their failure to provide adequate and sufficient warnings to Plaintiff and to foreseeable users of the defective Product.

<u>**COUNT V: BREACH OF EXPRESS WARRANTY**</u>

131.     Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth herein.

132.     Defendants made assurances as described herein to the general public, hospitals, and health care professionals that the Product was safe and reasonably fit for its intended purposes.

133.     As a result of Defendants' research and testing, or lack thereof, they distributed false information including, but not limited to, assuring Plaintiff, the public, and Plaintiff's healthcare providers and physicians that the Product was safe for use as a means of providing relief from SUI and was as safe or safer than other products and/or procedures available and on the market. As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiff, and the public at large.

134.     The information that Defendants distributed to the public, the medical community, the FDA, and Plaintiff included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, and other commercial media containing material representations, which were false and misleading and contained omissions and concealment of the truth about the dangers of the use of the Product.

135.     Defendants' intent and purpose in making these misrepresentations were to deceive the public, the medical community, and Plaintiff; to gain the confidence of the public, the medical community, and Plaintiff; to falsely assure the public, the medical community, and Plaintiff of the quality and fitness for use of the Product; and to induce Plaintiff, the public and

the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Product.

136.    Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Product.

137.    At the time the representations were made, Plaintiff and her healthcare providers did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the Product. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

138.    Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the Product to the public at large for the purpose of influencing the sales of the Product known to be dangerous and defective and/or not as safe as other alternatives.

139.    Plaintiff and/or her healthcare provider chose the Product based upon Defendants' warranties and representations as described herein regarding the safety and fitness of the Product.

140.    Plaintiff, individually, and/or by and through her physician, reasonably relied upon Defendants' express warranties and guarantees that the Product was safe, merchantable, and reasonably fit for its intended purposes – and stated the Product was permanent, safe, and approved by the FDA and had low complications, had high success rates, and utilized material that performed better than alternative options available to the Plaintiff.

141.    Defendants breached these express warranties because the Product implanted in Plaintiff was unreasonably dangerous and defective as described herein and not as Defendants had represented.

142.    Defendants' breach of the express warranties resulted in the implantation of the unreasonably dangerous and defective Product in the body of Plaintiff, thereby placing Plaintiff's health and safety in jeopardy.

143.    As a direct and proximate result of Defendants' breach of the aforementioned express warranties, Plaintiff has experienced significant mental and physical pain and suffering and has sustained permanent injury, as set forth herein, has undergone medical treatment and likely will undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VI: BREACH OF IMPLIED WARRANTY

144.    Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth herein.

145.    Defendants impliedly warranted that the Product was merchantable and fit for the ordinary purposes for which it was intended.

146.    When the Product was implanted in Plaintiff to treat her SUI, the Product was being used for the ordinary purpose for which it was intended.

147.    Plaintiff, individually, and/or by and through her physician, relied upon Defendants' implied warranties of merchantability in consenting to have the Product implanted in her.

148.   Defendants breached these implied warranties of merchantability because the Product implanted in Plaintiff was neither merchantable nor suited for its intended use as warranted.

149.   Defendants' breach of their implied warranties resulted in the implantation of the unreasonably dangerous and defective Product in the body of Plaintiff, thereby placing Plaintiff's health and safety in jeopardy.

150.   As a direct and proximate result of Defendants' breach of the aforementioned implied warranties, Plaintiff has experienced significant mental and physical pain and suffering and has sustained permanent injury, as set forth herein, has undergone medical treatment and likely will undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VII: DISCOVERY RULE, TOLLING, AND FRAUDULENT CONCEALMENT

151.   Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth herein.

152.   Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

153.   Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

154.     Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages and their relationship to the Product were not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's action was filed well within the applicable statutory limitations period.

155.     The running of the statute of limitations in this action is tolled due to equitable tolling. Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment through affirmative misrepresentations and omissions from Plaintiff and Plaintiff's physicians of the true risks associated with the Product. As a result of Defendants' fraudulent concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

## COUNT VIII:  GROSS NEGLIGENCE

156.     Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth herein.

157.     In committing the acts and/or omissions set forth herein that directly and proximately caused Plaintiff's injuries, as set forth herein, Defendants breached their duty to Plaintiff and demonstrated a conscious, reckless, willful, and wanton indifference to and disregard of the consequences of their actions and/or omissions.

158.     Defendants have known and continue to know that some of the predicate product for their pelvic mesh products had high failure and complication rates, resulting in the recall of

some of these predicate devices; that there were and are differences between the Defendants' Product and some or all of the predicate products, rendering them unsuitable for designation as predicate products; that significant differences exist and existed between the Product and its predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and that the Product was and is causing numerous patients severe injuries and complications. Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, or the patients. As a result, Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers, and patients, into believing that the Product and the procedures for its implantation were and are safe and effective. This led to the prescription for and implantation of the Product into Plaintiff.

159.    The injuries, conditions, and complications suffered by women who have been implanted with Defendants' Product include, without limitation: mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, the recurrent prolapse of organs, and, in many cases, the women have been forced to undergo intensive medical treatment including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and surgery to remove portions of the female genitalia.

160.    Again, Defendants had sole access to material facts concerning the defective nature of the Product and their propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Product.

161.    Defendants were grossly negligent by showing a complete indifference for the safety and health of Plaintiff and others similarly situated in negligently designing, packaging, labeling, marketing, advertising, promoting, distributing, and selling the defective and unreasonably dangerous Product and in negligently failing to warn Plaintiff of the significant risks and complications associated with the Product, as set forth above.

162.    In light of the knowledge Defendants had concerning the risks and complications associated with their Product, as set forth above, Defendants continued to show an utter disregard and complete indifference for the safety of Plaintiff by failing to provide adequate warnings concerning the risks and complications associated with their Product, making material misrepresentations and placing profits from sales of its device over the safety of patients receiving their Product.

163.    The wrongs done by Defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law will not allow, and for which Plaintiff seeks exemplary damages, in that Defendants' conduct, including the failure to comply with applicable industry standards, was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and Defendants actually were objectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff; or included a material representation

that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff.

164.    As a direct and proximate result of Defendants' gross negligence, Plaintiff has experienced significant mental and physical pain and suffering and has sustained permanent injury, as set forth herein, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT IX: PUNITIVE DAMAGES

165.    Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth herein.

166.    Defendants sold the Product to the healthcare providers of Plaintiff in the state of Florida and throughout the United States without doing adequate testing to ensure that the Product was reasonably safe for implantation in the female pelvic area.

167.    Defendants sold the Product to Plaintiff's health care providers and other health care providers in the state of Florida and throughout the United States in spite of their knowledge that the Product can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this Complaint, thereby causing severe and debilitating injuries suffered by Plaintiff and numerous other women.

168.    Defendants ignored reports from patients and health care providers throughout the United States and elsewhere of the Product's failures to perform as intended, which lead to the severe and debilitating injuries suffered by Plaintiff and numerous other women. Rather than doing adequate testing to determine the cause of these injuries or to rule out the Product's

designs or the processes by which the Product is manufactured as the cause of these injuries, Defendant chose instead to continue to market and sell the Product as safe and effective.

169.     Defendants withheld material information from the medical community and the public in general, including Plaintiff, regarding the safety and efficacy of the Product.

170.     Defendants knew and recklessly disregarded the fact that the Product caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat SUI.

171.     Defendants misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries caused by the Product.

172.     Notwithstanding the foregoing, Defendants continue to aggressively market the Product to consumers, without disclosing the true risks associated with the Product.

173.     Defendants knew of the Product's defective and unreasonably dangerous nature, but continued to mislead physicians and patients and to manufacture, market, distribute, and sell the Product so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff.

174.     Defendants continue to conceal and/or fail to disclose to the public, including the Plaintiff, the serious complications associated with the use of the Product to ensure continued and increased sales of the Product.

175.     Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that the Court enter judgment in her favor against Defendants for actual, compensatory, and punitive/exemplary damages, plus attorneys' fees and expenses, costs, interest, and such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all claims so triable in this action.

Dated: January 31, 2022

Respectfully submitted,

**THE MAHER LAW FIRM**

/s/ *Jason R. Fraxedas*
Jason R. Fraxedas, Esq.
Florida Bar # 63887
Matthew S. Mokwa, Esq.
Florida Bar # 47761
398 West Morse Blvd, Suite 200
Winter Park, FL 32789
407-839-0866
jrfraxedas@maherlawfirm.com
mmokwa@maherlawfirm.com

**WAGSTAFF & CARTMELL, LLP**

/s/ *Diane K. Watkins*
Diane K. Watkins
MO Bar #57238 (*pro hac vice* forthcoming)
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO  64112
Tel. (816) 701-1100
Fax (816) 531-2372
dwatkins@wcllp.com

*Counsel for Plaintiff*